**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

|  |  |  |
|---|---|---|
| JOAN HORAN, individually and as | : | |
| Executrix of the Estate of | : | |
| Gary W. Horan, Jr., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 12-7802 (JAP) |
| | : | |
| RELIANCE STANDARD LIFE | : | **OPINION** |
| INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |

_____:

This is an action brought by Plaintiff Joan Horan, both individually and as the Executrix of the Estate of Gary W. Horan, Jr., against Reliance Standard Life Insurance Company ("Reliance Standard" or "Defendant") to recover the remainder of certain term life insurance benefits. Ms. Horan is the surviving spouse of the decedent Gary W. Horan, Jr., and the beneficiary of the life insurance that is the subject matter of this suit. Ms. Horan bases her claim on for breach of contract and violations of the New Jersey Plain Language Review Act, *N.J.S.A.* 56:12-1 to 13, or, in the alternative, violations of the Employee Retirement Income Security Act ("ERISA").

Presently before the Court is Defendant Reliance Standard's motion to dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Additionally before the Court is Plaintiff's cross-motion to amend her complaint. For the reasons set forth herein, the Court will

grant Defendant's motion in part and deny it in part, and will grant Plaintiff's motion to amend her complaint.

## I.     Background

Gary Horan was employed by Premiere Global Services, Inc. and was eligible for certain benefits as part of his employment with the company. *See* Am. Compl. First Count at ¶ 1. Of relevance here, Mr. Horan was insured by Reliance Standard for a total amount of $667,000.00 as one of these benefits. *Id.* This total amount included basic and supplemental coverage under group life insurance policy GL137772 (the "Group Life Policy") and basic accident coverage under group accident policy number VAR202974 (the "Group Accident Policy"). *See* Declaration of Heather J. Austin ("Austin Decl.") Exs. C, D.

Under the Group Life Policy, Mr. Horan's employer paid all premiums due for its employees' basic coverage. *See* Ex. C at 1.1. Mr. Horan also elected to maintain additional, supplemental coverage under the Group Life Policy. *See* Austin Decl. Ex. B. He had to pay for this supplemental insurance himself. *See* Ex. C at 1.1. The coverage available under the Group Life Policy had certain limits. Under the policy, the basic coverage amount of insurance was equal to "[o]ne and a half (1 ½) times Earnings, rounded to the next higher $1,000, subject to a maximum of $500,000." Ex. C at 1.0. The amount of insurance offered under the supplemental coverage, which was available only to those who had elected supplemental coverage and were paying the premium, was equal to "[a] choice of: one (1), two (2), three (3) or four (4) time Earnings, rounded to the next higher $1,000. . . ." *Id.* Mr. Horan's salary was $95,155.79. *See* Austin Decl. Ex. E. Therefore, under the Group Life Policy Plan, Mr. Horan was entitled to a maximum of $143,000 in basic life insurance, and a maximum of $381,000 in supplemental life coverage. *See* Ex. C at 1.1. Thus, the maximum amount of coverage that Mr. Horan was entitled

to under the Group Life Policy was $524,000, a number representing the combined basic and supplemental life insurance coverage. *See* Ex. C. at 1.1.

The Group Life Policy also contained a "Conversion Privilege" that provided the right to convert to an individual insurance policy, underwritten by Reliance Standard, when the employee stopped being covered under the Group Life Policy Plan. *Id.* at 5.0. It also contained a "Portability" provision by which an employee could, upon written application and continued payment of premiums, maintain coverage after he or she ceased being an employee until, *inter alia*, the date the Group Life Policy would terminate. *Id.* at 13.0. If the ported insurance terminated because the Group Life Policy reached the date it would otherwise terminate, then the insurance coverage could "be converted to an individual life insurance policy the terms and conditions set forth under the Conversion Privilege." *Id.*

Like the Group Life Policy Plan, Mr. Horan's employer also paid the entirety of the premiums due for basic coverage under the Group Accident Policy. *See* Ex. D at 1.0. Unlike the Group Policy Plan, supplemental coverage was not an option under the Group Accident Policy. *See generally* Ex. D. The coverage available under the Group Accident Policy was "one and one half (1 ½) times Earnings, rounded to the next $1,000, subject to a maximum of $500,000." *Id.* at 1.0. Consequently, based upon his salary of $95,155.79, Mr. Horan was entitled to a maximum amount of coverage of $143,000 in basic accidental coverage under the Group Accident Policy. *See* Ex. C at 1.0. Therefore, the combined total amount of maximum coverage available and issued to Mr. Horan throughout his employment from both the Group Life Policy and the Group Accident Policy was $667,000.

After his employment ended, Mr. Horan sought to port his employee group life insurance to an individual policy. *See* Ex. E. Of the insurance offered by his employer, only the Group

Life Policy contained a portability provision.  *See* Ex. C at 13.0; Ex. D.  The Group Life Policy's

Portability provision establishes:

> An Insured may continue insurance coverage under this Policy and that of his/her insured Dependents, if any, if coverage would otherwise terminate because he/she ceases to be an Eligible Person, for reasons other than the termination of this Policy, the Insured's retirement, or the insured Dependent having reached the maximum age for benefits. . . .
>
> The amount of coverage available under the Portability provision will be the current amount of coverage the Insured and that of his/her insured Dependents, if any, is insured for under the Policy on the last day he/she was Actively at Work. However, the amount of coverage will never be more than:
> 1. the highest amount of life insurance available to Eligible Persons; or
> 2. the total of $750,000 from all RSL group life and accidental death and dismemberment insurance combined, whichever is less.

Ex. C. at 13.0.  As discussed, the highest amount of life insurance available under the

Group Life Policy was $524,000.

The Term Life Insurance Portability Request form that Mr. Horan completed and

signed applied to life insurance policy GL137772 – the Group Life Policy.  *See* Ex. E.

Under the employer portion of the form, Mr. Horan's employer stated that the "Amount

of Term Life Insurance (including the amount of any AD&D rider coverage, if

applicable) in force under the Policy on date of termination" was $667,000.  *Id.*  There is

no Accidental Death and Dismemberment (AD&D) rider under the Group Life Policy.

The form also requires an applicant to identify the "Amount of Cover Desired (must be

equal to or less than amount in force)."  *See id.*  In his completed form, Mr. Horan wrote

a total of $667,000.  *See id.*  As mentioned, the combined amount of insurance available

to Mr. Horan was $667,000; the maximum amount of basic term life insurance available

to Mr. Horan, however, was $524,000.

On or about November 1, 2009, Reliance Standard issued to Mr. Horan basic term life insurance coverage in the amount of $667,000. *See* Ex. F; Am. Compl. First Count at ¶¶ 1, 4. Plaintiff Joan Horan was named as the beneficiary to this life insurance. Thereafter, on November 13, 2009, Reliance Standard issued Mr. Horan a letter, which stated that his November 11, 2009 request to port his group coverage had been received for the coverage period of November 1, 2009 to February 1, 2010. Ex. F; Am. Compl. First Count at ¶¶ 1, 4. The letter indicated that the coverage amount was $667,000. Am. Compl. First Count at ¶¶ 1, 4. On December 10, 2009, Reliance Standard wrote to Mr. Horan, informing him that the new life insurance coverage that they issued "replaces the group insurance coverage which [he] had through [his] employer." *Id.* at ¶ 6. Mr. Horan was issued individual coverage in the amount of $667,000. *Id.* Based on that coverage amount, Mr. Horan paid a quarterly deductible of $540.27. *Id.* at ¶ 5.

On or about October 21, 2010, Mr. Horan died from cancer. *Id.* at ¶ 13. Plaintiff Joan Horan, as the beneficiary, presented a claim for $667,000 in term life insurance benefits under the policy. On or about January 3, 2011, Reliance Standard denied Plaintiff's claim for $143,000 out of $667,000 in term life insurance benefits. *Id.* at ¶¶ 15-16. The $524,000 of disbursed proceeds "represented the $143,000 in (portated) based group life insurance coverage and $381,000 in (portated) supplemental group term life insurance." *Id.* Reliance Standard asserted that it denied the remainder of the claim because that amount was for accidental death insurance only, and Mr. Horan did not die as a result of an accident. *See* Ex. A. Between November 1, 2009 and Mr. Horan's date of death on October 21, 2010, Reliance Standard never issued any documents that indicated Mr. Horan had any coverage other than term life coverage in the amount of $667,000. Am. Compl. First Count at ¶ 19.

Plaintiff claims that Reliance Standard owes to her the remaining $143,000. She filed

this action on November 8, 2012 in the Superior Court of New Jersey, Law Division, Ocean

County, seeking damages based on the alleged failure of Reliance to pay her entire claim.

Defendant removed the matter to this Court on December 21, 2012. Plaintiff filed an amended

complaint, in which she pleaded alternatively for damages under ERISA. Defendant Reliance

Standard moves to dismiss the amended complaint, arguing that ERISA preempts Plaintiff's state

law claims for breach of contract and a violation of the New Jersey Plain Language Act.

Reliance Standard also contends that Plaintiff's alternative ERISA claims must fail as well.

Plaintiff opposes this motion, and additionally requests leave to file a second amended

complaint.

## II.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint

"for failure to state a claim upon which relief can be granted." When reviewing a motion to

dismiss, courts must first separate the factual and legal elements of the claims, and accept all of

the well-pleaded facts as true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

All reasonable inferences must be made in the Plaintiff's favor. *See In re Ins. Brokerage

Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). This standard requires the plaintiff to show "more than a sheer possibility that a

defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "plaintiff's

obligation to provide the grounds of his entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  When assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  Any legal conclusions are "not entitled to the assumption of truth" by a reviewing court.  *Id*. at 679.  Rather, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id*.; *see also Fowler*, 578 F.3d at 210 (explaining that "a complaint must do more than allege a plaintiff's entitlement to relief").

Generally, the Court's task in assessing a motion to dismiss requires it to disregard any material beyond the pleadings.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  A district court may, however, consider the factual allegations within other documents, including those described or identified in the complaint and matters of public record, if the plaintiff's claims are based upon those documents.  *See id.* at 1426; *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (explaining that the court may properly consider the "complaint, exhibits attached to the complaint, matters of public record, as well as indisputably authentic documents if the complainant's claims are based upon these documents").  Furthermore, a court need not accept allegations as true that are contradicted by the documents upon which a party's claims are based.  *See Warburton v. Foxtons, Inc.*, Civil Action No. 04-2474, 2005 U.S. Dist. LEXIS 39615, at *10 (D.N.J. June 13, 2005) (citing *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 F. App'x. 94, 99-100 (3d Cir. Jan. 10, 2002)).  Accordingly, in resolving this motion, the Court shall consider the exhibits attached to the Declaration of Heather J. Austin ("Austin Decl."), all of which either form the basis of Plaintiff's

claims or are referenced directly in the Complaint.[1]  Therefore, the Court relies on these

documents in deciding the Motion to Dismiss.

## III.  Legal Discussion

### A.  Applicability of ERISA

Defendant Reliance Standard argues that Plaintiff's state law claims are preempted

because ERISA applies to the plan in question.  *See Ingersoll-Rand Co. v. McClendon*, 498 U.S.

133, 138-39 (1990); *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 83 (3d Cir. 2012).  Plaintiff's state law

claims seek recovery under a breach of contract theory and the New Jersey Plain Language Act.

If ERISA applies, these claims may be preempted if they "relate to" an employee benefit plan,

*Shaw v. Delta Air Lines*, 463 U.S. 85, 96-97 (1983), and "do not attempt to remedy any violation

of a legal duty independent of ERISA."  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004);

*Sturgis v. Mattel, Inc.*, 525 F. Supp. 2d 695, 708 (D.N.J. 2007).

There is no dispute that the Group Life Policy and the Group Accident Policy qualify as

employee welfare benefit plans that are governed by ERISA.[2]  Plaintiff argues, however, that

ERISA does not govern this case because the issues do not focus on an employer plan, but rather

center around ported life coverage, which they assert is more like a conversion policy.  *See* Pl.'s

Opp. Br. at 13-15.  As Reliance Standard points out, there is a split in the authority among

circuits as to whether a conversion policy is covered by ERISA, although the Third Circuit has

yet to address the issue.  While some courts have held that an ERISA-governed policy may be

---

[1] These exhibits include Reliance Standard Life Insurance Company's January 3, 2011 letter to Plaintiff, Reliance Standard Life Insurance Company's group life policy number GL137772 and group accident policy number VAR202974, Mr. Gary Horan's Term Life Insurance Portability Request, and Reliance Standard Life Insurance Company's Portability Premium Notice.  Plaintiff does not dispute the authenticity of any of these documents and, indeed, references several of them in her Opposition brief.

[2] Even if this was disputed, it is clear that Group Life Policy falls outside the ERISA Safe Harbor Provision.  *See* 29 C.F.R. § 2510.3-1(j).  Under the terms of the Group Life Policy, basic coverage was provided to each eligible, full-time employee and the employer was responsible for paying these costs.  Ex. C at 1.0; Ex. D at 1.0.  Thus, ERISA governs the Group Life Policy.

"converted" to a non-ERISA policy if an employee who has left a company exercises a contractual right to convert to an individual plan, other courts have found that a converted policy is a component of the original ERISA plan and thus covered by ERISA. *Compare Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 876 (9th Cir. 2001) (holding that a conversion policy is "independent of the ERISA plan and does not place any burdens on the plan administrator or the plan"), *and Demars v. CIGNA Corp.*, 173 F.3d 443, 446 (1st Cir. 1999) (finding that conversion policies are not governed by ERISA because "employers do not bear any administrative or financial responsibility for them"), *with Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 440 (8th Cir. 1997) (explaining that a conversion policy was a "component" of the original ERISA plan and thus governed by ERISA), *and Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1346-47 (11th Cir. 1994) (finding that a conversion policy for a group of ex-employees was governed by ERISA).

The Court, however, need not determine whether a conversion policy is governed by ERISA because the issues in this case focus on ported life insurance. Unlike the cases in which courts have held that converted coverage is not governed by ERISA, Mr. Horan did not exercise his contractual right to convert his coverage. *See Waks*, 263 F.3d at 874 (explaining that the employee had applied for individual coverage pursuant to the conversion rights of the group policy); *Demars*, 173 F.3d at 444 (explaining that the plaintiff had "elected to convert her group coverage to an individual…policy" pursuant to the "conversion clause" that was found in the group policy); *see also Brown v. Paul Revere Life Ins. Co.*, Civil Action No. 01-1931, 2002 U.S. Dist. LEXIS 8994, at *24-26 (E.D. Pa. May 20, 2002). Rather, Mr. Horan explicitly and affirmatively chose to port his coverage. While "conversion" allows a former employee to continue life insurance coverage by converting the policy to an individual life insurance policy,

"porting" a group life insurance policy means a former employee may maintain optional coverage through the employer's group policy on the same terms for a period of time. *See* Ex. C at 5.0, 13.0. *See Terry v. Northrop Grumman Health Plan*, Civil Action No. 12-263, 2013 U.S. Dist. LEXIS 17492, at *2 n.1 (M.D. Pa. Dec. 13, 2013); *Stephens v. Citation Corp.*, 705 F. Supp. 2d 1291, 1293 (N.D. Ala. 2010).

This means that, unlike a converted policy that is now arguably independent from the ERISA plan because it involves a new policy issued to an individual, Mr. Horan's ported coverage continued under the ERISA-governed Group Life Policy. The very words of the Portability provision make this point clear. That section provides that an insured employee "may **continue** insurance coverage under **this Policy**. . . ." Ex. C at 13.0 (emphasis added). The section also explains that if the ported coverage terminates because the Group Life Policy reached the date it would terminate, then the ported coverage "may be converted to an **individual life insurance policy** the terms and conditions set forth under the Conversion Policy." *Id.* (emphasis added). Therefore, because Mr. Horan applied for and received ported coverage that continued under the ERISA-governed employee benefit plan, rather than converting his insurance into an individual life insurance policy, the terms of his insurance continued to be governed by ERISA. *See Mass. Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997) (holding that ERISA preempted state law claims when employee's post-employment disability insurance policy was not "converted" to individual insurance but rather remained in effect under the same policy and therefore was akin to "continuation coverage").

Because ERISA applies to this case, the Court must now determine whether Plaintiff's state law claims are preempted. *See* 29 U.S.C. § 1144(a).

> The preemption clause of ERISA is notable for its breadth, and manifests Congress's intention to establish pension plan regulation as an exclusively federal

> concern. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 101 S. Ct. 1895, 68
> L. Ed. 2d 402 (1981). The Supreme Court has noted that a state law "relates to"
> an ERISA governed plan, within the meaning of § 514(a)'s preemptive reach, "if
> it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines*, 463
> U.S. 85, 97, 103 S. Ct. 2890, 2900, 77 L. Ed. 2d 490 (1983).

*Keystone Chapter, Assoc. Builders & Contractors v. Foley*, 37 F.3d 945, 954 (3d Cir. 1994)

(quoting *United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Mem'l Hosp.*, 995

F.2d 1179 (3d Cir. 1993)). Under this "broad common-sense meaning," a state law may "relate

to" a benefit plan, and therefore be preempted, even if the law is not specifically designed to

affect such plans, or has only an indirect effect on the plan. *See Pilot Life Ins. Co. v. Dedeaux*,

481 U.S. 41, 47-48 (1987) (citing *Shaw*, 463 at 96-99); *United Wire*, 995 F.2d at 1192. There

are, however, some limits on the otherwise far reaching impact of ERISA; specifically, "some

state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to

warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21. Here,

Plaintiff's Amended Complaint alleges two different state law claims: breach of contract and a

violation of the New Jersey Plan Language Act. Because both of these state laws "relate to" the

ERISA-governed plan, they are preempted.

       1.    <u>Breach of Contract Claim</u>

Plaintiff's first claim alleges a breach of contract claim by Reliance Standard. This claim

must be dismissed. "The pre-emption provision was intended to displace all state laws that fall

within its sphere, even including state laws that are consistent with ERISA's substantive

requirements." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985) (citing *Shaw*,

463 U.S. at 98-99); *see also Aetna Health*, 542 U.S. at 208 (explaining that ERISA includes

"expansive pre-emption provisions…which are intended to ensure that employee benefit plan

regulation would be exclusively a federal concern"). Therefore, state law claims will "ordinarily

fall within the scope of ERISA preemption, if the claims relate to an ERISA-governed benefits plan." *Ford v. Unum Life Ins. Co. of Am.*, 351 F. App'x. 703, 706 (3d Cir. 2009) (affirming dismissal of claims of breach of contract, negligence, and intentional infliction of emotional distress). Here, Count I alleges that Reliance Standard breached its contract by refusing to pay the entirety of Plaintiff's insurance claim. Because this breach of contract claim relates to an ERISA-governed plan, it is preempted. Consequently, Count I must be dismissed with prejudice. *See Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir. 1989) (finding that breach of contract claim is preempted by ERISA).

### 2. New Jersey Plain Language Act

The New Jersey Plain Language Act requires that a "consumer contract" must be "written in a simple, clear, understandable and easily readable way." *See N.J.S.A.* 56:12-2. The Plain Language Act defines a "consumer contract," in relevant part, as a "written agreement in which an individual…obtains insurance coverage, **except insurance coverage contained in policies subject to the 'Life and Health Insurance Policy Language Simplification Act[,]'**…for cash or on credit and the money, property, or services are obtained for personal, family or household purposes." *N.J.S.A.* 56:12-1(c) (emphasis added). This definition is essential here, because the noted exception to what constitutes a "consumer contract" for purposes of the statute applies directly to the insurance policy involved here.

The New Jersey Life and Health Insurance Policy Language Simplification Act, *N.J.S.A.* 17B:17-17 to – 25 (hereinafter, the "Health Insurance Simplification Act"), attempts to "establish minimum standards for language used in policies, contracts and certificates of life insurance, health insurance, annuity, credit life insurance and credit health insurance, delivered or issued for delivery in this State, to facilitate ease of reading by insureds." *N.J.S.A.* 17B:17-18. The Health

Insurance Simplification Act covers "any policy, contract, certificate or agreement of life or health insurance," including "any certificate issued pursuant to a group insurance policy delivered or issued for delivery in this State." *N.J.S.A.* 17B:17-19. Therefore, it appears that the Plain Language Act, with its protection for "consumer contracts," has no applicability here, where the contract at issue is a life insurance policy. For this reason alone, Plaintiff's claim for a violation of the New Jersey Plain Language Act by Reliance Standard in Count II should be dismissed.

It should be noted, however, that under either the Plain Language Act or the Health Insurance Simplification Act, Plaintiff's claim would be dismissed because it would be preempted by ERISA. As discussed, ERISA preempts state laws that "relate to" an ERISA-governed policy. "A rule of law relates to an ERISA plan if it is specifically designed to affect employee benefit plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan." *United Wire*, 995 F.2d at 1192. Furthermore, "[u]nder § 514(a), ERISA pre-empts any state law that refers to or has a connection with covered benefit plans…even if the law is not specifically designed to affect such plans, or the effect is only indirect, and even if the law is consistent with ERISA's substantive requirements." *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 129-31 (1992) (internal citations omitted).

It is clear that both of these statutes refer to employee benefit plans regulated by ERISA. The Health Insurance Simplification Act establishes certain "minimum standards for language used in" life insurance policies, including group life insurance policies. *N.J.S.A.* 17B:17-18. The purpose of establishing such standards is to make the insurance contract more readable and understandable to the purchaser. The overall goal was to protect the consumer from an insurance

company improperly refusing to pay policy claims." *Daly v. Paul Revere Variable Annuity Ins. Co.*, 199 N.J. Super. 584, 591 (Law Div. 1984). Likewise, the Plain Language Act requires consumer contracts to "be written in a simple, clear, understandable and easily reasonable way." *N.J.S.A.* 56:12-2. The statute designates certain parties, including the court and the attorney general, to determine if the consumer contract has been written in such a way, taking into consideration guidelines set forth by the Act. *See id.*; *see also N.J.S.A.* 56:12-10. Insofar as either statute tries to rewrite or regulate the language of ERISA-governed employee benefit fans, they are pre-empted by ERISA. State laws that impose "requirements by reference to such covered programs must yield to ERISA." *Greater Washington Bd. of Trade*, 506 U.S. at 131. Here, the very terms of the statute require a court to direct its inquiry to the language of a covered plan, and consequently very much "relate to" an ERISA plan. *See Ingersoll-Rand*, 498 U.S. at 140.

Furthermore, the framework of ERISA "ensures that employee benefit plans be governed by written documents and summary plans descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.*, 58 F.3d 896, 902 (3d Cir. 1995). One of the central goals of ERISA was to "enable plan beneficiaries to learn their rights and obligations at any time." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). While both New Jersey statutes have similar noble goals of enabling a consumer and/or a beneficiary to learn their rights, "ERISA already *has* an elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents." *Id.* (emphasis in original). ERISA's "comprehensive set of reporting and disclosing requirements" gives effect to this written plan

documents scheme – a scheme which forms the basis of ERISA's "core functional requirements." *Id.* With that in mind, this Court finds that such an attempt to control the language of an ERISA-governed plan clearly "relates to" a plan. Therefore, this Court finds that, even if Plaintiff properly pled her claim in Count II under the appropriate statute, ERISA would have preempted either statute. Consequently, Count II of the Plaintiff's Amended Complaint is dismissed with prejudice.

### B.     Count III of Plaintiff's Complaint

In Count III of her Amended Complaint, Plaintiff brings a claim under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132 (a)(1)(B), seeking recovery of life insurance benefits allegedly due to her under the terms of the Plan. Section 502(a)(1)(B) provides a cause of action to a participant or beneficiary of a plan "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Courts have stressed the importance of recovering only what is available "under the terms of his plan;" as such, the right to benefits "under a plan can **only** be found if it is **established by the terms of the ERISA-governed employee benefit plan**." *In re Unisys*, 58 F.3d at 902 (emphasis added). *See also Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3d Cir. 2000) ("Only the plan itself can create an entitlement to benefits."). The existence of a written employee benefit plan is one of ERISA's "core functional requirements," around which ERISA has built "an elaborate scheme…for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents." *Curtiss-Wright*, 514 U.S. at 83. "ERISA plan participants have a duty to inform themselves of the details provided in their plans." *Bicknell v. Lockheed Martin Group Benefits Plan*, 410 F. App'x. 570, 575 (3d Cir. 2011) (quoting *Jordan v. Fed. Exp. Corp.*, 116 F.3d 1005,

1016 (3d Cir. 1997)). "Consequently, this court is required to enforce the Plan as written unless it can find a provision of ERISA that contains a contrary directive." *Bellas*, 221 F.3d at 522 (internal quotation omitted).

Plaintiff asserts that Reliance Standard's refusal to pay $143,000 of Mr. Horan's term life coverage on the basis that this portion of Mr. Horan's coverage was for accidental death benefits is an attempt to retroactively reduce the $667,000 in life insurance coverage that Mr. Horan had ported. *See* Pl.'s Opp. Br. at 17. This argument, however, misses the essential point that Mr. Horan never had the ability to port $667,000 in life insurance coverage. Here, under the terms of the Group Life Policy, the maximum amount of coverage Mr. Horan was eligible for was $524,000. Specifically, as discussed, under the terms of the Group Life Policy, Mr. Horan was entitled to a maximum basic life benefit of $143,000 as well as a maximum supplemental life benefit of $381,000. The portability provision of the Group Life Policy, under which Mr. Horan ported his insurance, allowed an insured employee to continue his or her insurance coverage in the current amount of coverage that the employee was insured for on the last day he or she was actively at work. The provision specifies that this amount of coverage "will never be more than: (1) the highest amount of life insurance available to Eligible Persons; or (2) a total of $750,000 from all RSL group life and accidental death and dismemberment insurance combined, whichever is less." Ex. C at 13.0. In this case, the lesser amount is $524,000, which is the highest amount of life insurance available to Mr. Horan.

A review of the Group Life Policy clearly shows that the maximum amount of life insurance that Mr. Horan was entitled to was $524,000. The portability provision is likewise clear that this was the maximum amount of insurance coverage that Mr. Horan was entitled to continue. Consequently, by the clear terms of the Group Life Policy, Mr. Horan was only

entitled to $524,000. This is the amount that Plaintiff, Mr. Horan's beneficiary, received from Reliance Standard. Therefore, Plaintiff has no further claim for benefits due under the terms of the plan.

Plaintiff next argues that the Portability Request Form and subsequent portability premium notices sent to Mr. Horan by Reliance modified or amended the plan. Specifically, she asserts that even if the "master insurance policy or policies do not permit Defendant to issue $667,000 in life insurance coverage to Plaintiff's decedent," then Defendant Reliance Standard agreed to and modified the coverage by issuing $667,000 in basic term life coverage. ERISA, however, precludes such informal amendments to employee benefit plans. Under an ERISA-governed plan, a person who has the authority to amend the plan must be identified within the plan, and amendments must be conducted according to these formal procedures. An amendment that is inconsistent with the governing instrument is ineffective. *See Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 81-82 (3d. Cir. 2004); *see also Confer v. Custom Eng'g*, 952 F.2d 41, 43 (3d. Cir. 1991). In this case, Mr. Horan's Group Life Policy dictates: "No agent has authority to change or waive any part of the Policy. To be valid, any change or waiver must be in writing. It must also be signed by one of our executive officers and attached to the Policy." *See* Ex. C at 3.0. Plaintiff's claim that an agent of either Reliance or Mr. Horan's employer modified the Plan fails to show that the Plan's procedure for modification was followed. Therefore, any theoretical modification of the terms of the Group Life Policy by either the Portability Request or the portability premium notices would be insufficient under ERISA in effectuating any actual change to the Plan. *See Confer*, 952 F.2d 41, 43 (3d Cir. 1991) ("Only a formal written amendment, executed in accordance with the Plan's own procedure for amendment, could change

the Plan.").  Therefore, the Plan was never modified to increase the amount of coverage permitted for Mr. Horan.

A court is required to enforce an ERISA-governed plan as written because only the plan itself can create an entitlement to benefits.  *Bellas*, 221 F.3d at 522.  Here, Plaintiff has received all the benefits to which she is entitled to under the terms of the plan and consequently has no further claim for benefits.   Therefore, the Court will dismiss Plaintiff's claim under Count III with prejudice, as amendment of this claim would be futile.  *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (explaining that a claim may be dismissed with prejudiced if amendment would be futile, meaning that the "the complaint, as amended, would fail to state a claim upon which relief could be granted").

### C.      Count IV of Plaintiff's Complaint

Plaintiff had originally amended her Complaint and added a claim under § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).  Plaintiff, however, wishes to voluntarily dismiss this claim. Therefore, Count IV of Plaintiff's Amended Complaint will be dismissed.

### D.      Count V of Plaintiff's Complaint

In Count V of her Amended Complaint, Plaintiff brings a claim under § 502(a)(3) of ERISA, 29 U.S.C. § 1132 (a)(3), which authorizes plan participants, beneficiaries and fiduciaries to seek appropriate equitable relief to redress ERISA violations.  *See Pell v. E.I. DuPont de Nemours & Co., Inc.*, 539 F.3d 292, 300 (3d Cir. 2008) (quoting 29 U.S.C. § 1132(a)(3)). Specifically, Plaintiff is seeking an equitable surcharge[3] in the amount of $143,000 for a breach of fiduciary duty by Reliance Standard.  Defendant Reliance Standard argues that the money damages sought by Plaintiff is a "demand for legal relief, which is not available under Section

---

[3] Surcharge is defined as "[t]he amount that a court may charge a fiduciary that has breached its duty."  Black's Law Dictionary 1579 (9th ed. 2009).

502(a)(3) of ERISA." Def's Br. 18. Plaintiff responds that, following the Supreme Court's decision in *Cigna Corp. v. Amara*, 131 S.Ct. 1866 (2011), the relief she is seeking here is considered "appropriate equitable relief" under § 502(a)(3). Pl.'s Opp. Br. 21.

In *Cigna*, the Supreme Court addressed the concern of the district court, which had implied that certain cases from the Supreme Court had "narrowed the application of the term 'appropriate equitable relief.'" 131 S.Ct. at 1878. The Court found that district court's concern to be "misplaced," as the Supreme Court has "interpreted the term 'appropriate equitable relief' in § 502(a)(3) as referring to 'those categories of relief that traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity.'" *Id.* (quoting *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 361 (2006)). After reviewing its prior cases interpreting §502(a)(3), the Supreme Court explained that relief coming in the form of a money payment did not, in and of itself, "remove it from the category of traditional equitable relief. Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Cigna*, 131 S.Ct. at 1880. This type of remedy, known as a surcharge, used to be "exclusively equitable" prior to the merger of law and equity, and "extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." *Id.* (citations omitted). The Court further explained that a showing of detrimental reliance was not necessary to justify the remedy of surcharge; rather, courts of equity "simply ordered a trust or beneficiary made whole following a trustee's breach of trust. In such instances equity courts would mold the relief to protect the rights of the beneficiary according to the situation involved." *Id.* at 1881 (quotation omitted). The Court concluded that an ERISA fiduciary could be surcharged under § 502(a)(3) only upon a showing of actual harm, proved by a preponderance of evidence. This

"actual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents." *Id.*

This Court agrees with Plaintiff that *Cigna* permits a surcharge as a form of "appropriate legal relief."[4] The decision in *Cigna* has broadened the relief available for a breach of fiduciary duty under §1132(a)(3). Requests for monetary relief are not automatically considered "legal" when characterizing the relief sought; rather, the *Cigna* decision makes clear that the characterization of the relief stems from the identity of the defendant as a fiduciary, the breach of a fiduciary duty, and the nature of the harm. Thus, Plaintiff may seek a surcharge as an equitable remedy under §1132(a)(3) if Plaintiff can demonstrate in fact that Reliance Standard breached its fiduciary duty to Plaintiff and Mr. Horan and that the breach caused them damages. *See Cigna,*

---

[4] In its brief, Defendant Reliance Standard offers up two reasons for why Plaintiff's request for an equitable surcharge is improper. First, Defendant Reliance Standard attempts to downplay the significance of *Cigna* by stressing that the Court's discussion of an equitable surcharge is dicta. Even assuming that the language from Cigna is dicta, the Third Circuit has explained, however, that the Supreme Court's "dicta are highly persuasive" and are not be viewed lightly. *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007). "Because the 'Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket,' failing to follow those statements could 'frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.'" *Id.* (quoting *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 561 (3d Cir. 2003)); *see also McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 182 n.2 (4th Cir. 2012) ("Even assuming for the sake of argument that it is, we cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court."). Next, Reliance Standard argues "that a monetary remedy is equitable only when the money sought by the plaintiff is clearly traceable to the funds in the defendant's possession." Def's Br. 19 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)). Defendant argues that the facts of *Cigna* satisfied this requirement because "[t]he surcharge discussed in dicta in *Amara* could potentially be recovered against an identifiable fund. . . ." *Id.* This argument is misplaced. In *Knudson*, the Supreme Court stressed the importance of tracing any monetary relief to a particular fund or property because "traditionally speaking, relief that sought a lien or constructive trust was legal relief, not equitable relief, unless the funds in question were 'particular funds or property in the defendant's possession.'" *Cigna*, 131 S.Ct. at 1878-79 (quoting *Knudson*, 534 U.S. at 213). On the other hand, as explained in *Cigna*, equity courts traditionally *had* the power to surcharge a fiduciary for losses resulting from "a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." *Id.* at 1880 (citations omitted). Therefore, the fact that Plaintiff is seeking a monetary surcharge does not make the relief legal, even when the requested funds are not "clearly traceable to the funds in the defendant's possession." Def.'s Br. 19. *See, e.g., Gearlds v. Entergy Servs.*, 709 F.3d 448, 452 (5th Cir. 2013); *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 883 (7th Cir. 2013) (holding that if plaintiff could demonstrate a breach of fiduciary duty, and if she can show that the breach caused actual damages, "she may seek an appropriate equitable remedy including make-whole relief in the form of money damages"); *McCravy*, 690 F.3d at 181 (finding that the "'surcharge,' i.e., 'make-whole relief,' constitutes 'appropriate equitable relief' under Section 1132(a)(3)" and agreeing that the plaintiff, as a beneficiary, could seek to surcharge the insurance company "in the amount of life insurance proceeds lost because of that trustee's breach of fiduciary duty").

131 S.Ct. at 1881-82; *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 879-82 (7th Cir. 2013); *Gearlds v. Entergy Servs.*, 709 F.3d 448, 450-52 (5th Cir. 2013); *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181-82 (4th Cir. 2012); *Weaver Bros. Ins. Assocs. v. Braunstein*, Civil Action No. 11-5407, 2013 U.S. Dist. LEXIS 41676, at *45-46 (E.D. Pa. Mar. 25, 2013).

This Court, therefore, must now turn to the question of if Plaintiff has appropriately pled facts to show that Reliance Standard breached its fiduciary duty to Plaintiff and Mr. Horan. Defendant Reliance Standard argues that it did not breach any duty it owed to Plaintiff because "the plan information in this case unambiguously stated that the amount of life insurance was limited to the Group Life coverage in force at the time the portability application was submitted." Def.'s Reply Br. 9-10. Reliance Standard asserts that "a claim for breach of fiduciary duty cannot stand when it is contrary to the unambiguous terms of the plan." *Id.* (citing *Jordan*, 116 F.3d at 1016).

The Third Circuit, however, has made clear that a breach of fiduciary duty claim may exist even if the language of the plan is unambiguous. For example, in *Jordan*, the plaintiff was not informed that post-retirement changes to his retirement plan selection were prohibited. This irrevocability provision, however, was contained within the plaintiff's plan. The Third Circuit recognized the duty of a plan participant to inform themselves of the details of his or her plan, and acknowledged that this provision could be found within the plaintiff's plan, but found that this did not necessarily bar a plaintiff's claim for a breach of fiduciary duty. The Court found, rather, that there was an issue of fact that precluded summary judgment with regards to whether the fiduciary breached its duty when it failed to reference the existence of the irrevocability restriction in a letter it wrote to the plaintiff before the plaintiff made his irrevocable election. *See Jordan*, 116 F.3d at 1014-16. Likewise, in *Curcio v. John Hancock Mut. Life Ins. Co.*, 33

F.3d 226, 231-32, 238-39 (3d Cir. 1994), the Third Circuit found that a breach of fiduciary duty

claim arose from a misleading statement in a video tape that described insurance benefits

coupled with a misleading statement in a pamphlet describing the insurance coverage, despite the

fact that the plan documents themselves were clear on the amount of coverage for which an

employee was eligible. *See also In re Unisys*, 57 F.3d at 1264 (explaining that a fiduciary who

fulfills its statutory disclosure obligations under ERISA may still "breach its fiduciary duty owed

to plan participants to communicate candidly if the plan administrator simultaneously or

subsequently makes material misrepresentations to those whom the duty of loyalty and prudence

are owed"); *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302-03 (3d

Cir. 1993) (holding that an ERISA fiduciary's failure to advise the plaintiff regarding her

COBRA rights could constitute a breach of fiduciary duty even though the fiduciary had

previously provided the information in a written COBRA notice and even though the omission

concerned facts which the plaintiff had not specifically inquired about).  Consequently, at this

stage of the proceedings, the fact that the plan information in this case may have been clear about

the amount of coverage that Mr. Horan was entitled to does not, in and of itself, bar an otherwise

plausible claim for breach of fiduciary duty from going forward.

Therefore, the Court must now determine if Plaintiff has sufficiently alleged a claim for

breach of fiduciary duty.  Plaintiff has alleged that Reliance Standard misrepresented that Mr.

Horan had $667,000 in term life coverage when apparently $143,000 was for accidental death

and dismemberment ("AD&D") coverage.  Plaintiff alleges that Reliance Standard issued a letter

to Mr. Horan in which it informed Mr. Horan that his group life insurance had been ported, and

that his coverage was in the amount of $667,000.  Thereafter, Reliance Standard issued a letter to

Mr. Horan that included an individual specification page that outlined Mr. Horan's life insurance

coverage.  The enclosed individual specification page allegedly stated that Mr. Horan had

$667,000 in basic term life coverage.  Reliance Standard thereafter issued four quarterly

premium statements in the amount of $540.27 for Mr. Horan's life insurance, which stated that

the premium payments were for life insurance.  The premium amount was based on a coverage

amount of $667,000 in basic term life insurance.  Plaintiff paid these premiums quarterly, and

Reliance Standard accepted such payments.

This Court finds that Plaintiff has sufficiently alleged a fiduciary breach by Reliance

Standard.  Here, it is plausible that Reliance Standard breached its duty to Plaintiff when it failed

to inform Mr. Horan that a certain portion of his coverage was actually for AD&D coverage,

meaning that the amount of basic term life coverage that he actually had was much less than he

anticipated, and/or when it misrepresented that Mr. Horan had a certain amount of term life

insurance.  As alleged by Plaintiff, Reliance Standard affirmatively and repeatedly represented to

and told Mr. Horan that he had term life insurance coverage in the amount of $667,000.   When

Reliance Standard denied a portion of Plaintiff's claim, it asserted that the basis for this denial

was that portion of the coverage was for AD&D coverage.  As Plaintiff points out, "the term 'life

insurance,' when given its fundamental and universally accepted meaning, does not include

AD&D coverage." *Curcio*, 33 F.3d at 231.  Plaintiff has made clear that at no point before the

partial denial of her claim did Reliance Standard inform either her or Mr. Horan that a portion of

Mr. Horan's coverage was allegedly for AD&D coverage–and, in fact, under the language of

either the Group Life Policy or the Group Accident Policy, Mr. Horan was not eligible to port his

AD&D coverage.  It is well-established that Reliance Standard, as an ERISA fiduciary, has an

obligation to convey complete and accurate information when it speaks to beneficiaries regarding

plan benefits.  *See Bixler*, 12 F.3d at1302-03.  Similarly, a fiduciary may not mislead or

misrepresent material terms of a plan, or make material omissions regarding the terms of a plan, to a plan participant or beneficiary.  *See In re Unisys*, 57 F.3d at 1264.   "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed [benefits] decision."  *Id.*  Plaintiff has alleged that Mr. Horan intended to have $667,000 in term life coverage, and died thinking he had that much coverage for his wife and two children.  Therefore, Plaintiff has plausibly alleged that Reliance Standard breached its fiduciary duty by communicating misleading information to, and withholding material information from, Mr. Horan that he relied upon to his detriment.  Count V of Defendant's Motion to Dismiss is denied.

### E.      Count VI of Plaintiff's Complaint

Finally, in Count VI of her Complaint, Plaintiff brings a claim for equitable estoppel.  "A beneficiary can make out a claim for 'appropriate equitable relief,' based on a theory of equitable estoppel."  *Pell*, 539 F.3d at 300 (internal quotation omitted).   "To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances."  *Id.* (quoting *Curcio*, 33 F.3d at 235).  Reliance Standard argues that Plaintiffs have failed to allege any facts establishing "extraordinary circumstances." The Court agrees.

The requirement of demonstrating extraordinary circumstances is a "heightened requirement" that obligates a plaintiff to "do more than merely make out the 'ordinary elements' of equitable estoppel." [5]  *Kurtz v. Phila. Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996).  Although "extraordinary circumstances" have not been specifically defined, they "generally involve acts of

---

[5] Although Plaintiff argues that it is not necessary to prove extraordinary circumstances in light of *Cigna*, the Third Circuit has since affirmed that a claim for equitable estoppel still requires extraordinary circumstances.  The Third Circuit expressly found that the decision in *Cigna* did not alter this conclusion, and therefore found no reason to depart from the longstanding rule that equitable estoppel requires a showing of extraordinary circumstances. *See Engers v. AT&T, Inc.*, 466 F. App'x 75, 81 n.9 (3d Cir. 2011).

bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." *Burstein v. Ret. Account Plan for Emp. of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 383 (3d Cir. 2003) (quoting *Jordan*, 116 F.3d at 1011). The Third Circuit has required a showing of affirmative acts of fraud or similarly inequitable conduct by an employer to satisfy this element. *See Kurz*, 96 F.3d at 1553. Here, Plaintiff has failed to allege any facts that show Reliance Standard acted in bad faith or engaged in fraud-like conduct. Plaintiff alleges that extraordinary circumstances exist here based upon the allegation that Reliance Standard repeatedly represented that Mr. Horan had $667,000 in life insurance coverage, the allegation that Plaintiff paid premiums for that coverage and Reliance Standard issued that coverage, the allegation that Mr. Horan died thinking he had that much coverage "leaving a widow with a high school education and limited employment prospects and two college age and/or bound children," and the allegation that Reliance Standard made these representations concerning the amount of coverage when Mr. Horan was "especially vulnerable." Am. Compl. Sixth Count at ¶ 6. These allegations, at best, satisfy the "ordinary elements" of equitable estoppel; a plaintiff, however, must do more to satisfy the heightened pleading requirement necessary to show extraordinary circumstances and successfully establish a claim for equitable estoppel under ERISA. *See Kurz*, 96 F.3d at 1553.

Therefore, Count VI of Plaintiff's Complaint will be dismissed. The Court believes that any additional amendments to this claim would be futile and thus dismisses Plaintiff's equitable estoppel claim against Reliance Standard with prejudice. *See Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988) ("Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss.").

### F.     Jury Demand

In her Amended Complaint, Plaintiff requests a jury trial "on all issues so triable." Am. Compl. at 9. "[C]auses of action authorized by section 502(a)(3) are by its terms explicitly equitable, and we have held there is no right to jury trial for them." *Pane*, 868 F.2d 631, 636 (3d Cir. 19890 (citing *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir. 1988)). Plaintiff's remaining claim is such an equitable claim, and therefore Plaintiff is not entitled to a jury trial and the demand will be stricken.

### IV.     Motion to Amend

Plaintiff has moved to amend her Amended Complaint to add two parties: Mr. Horan's former employer, Premier Global Services, and the Premier Global Services Inc. Health and Welfare Benefit Plan. The Second Amended Complaint also seeks to remove Plaintiff's claims under 29 U.S.C. § 1132(a)(2), and adds a request for all appropriate equitable relief under 29 U.S.C. § 1132(a)(3).

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend is generally freely given. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir.2004). A court may, however, deny a motion to amend when there is "bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiencies by amendments previously allowed or futility of amendment." *Lundy v. Adamar of New Jersey, Inc.*, 34 F.3d 1173, 1196 (3d Cir.1994) (internal citation omitted). An amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face." *Harrison Beverage Co. v. Dribeck Imps., Inc.*, 133 F.R.D. 463, 468 (D.N.J.1990) (internal quotation marks and citations omitted). In determining whether an amendment is "insufficient on its face," the Court employs

the Rule 12(b)(6) motion to dismiss standard. *See Alvin*, 227 F.3d at 121; *see also Twombly*, 550 U.S. at 570.

After reviewing the proposed amendments to the complaint, the Court will grant the motion to amend as it relates to the addition of the new parties, as well as the clarification of the equitable relief that Plaintiff is seeking under 29 U.S.C. § 1132(a)(3). Specifically, the amendment will be permitted to the extent that Plaintiff seeks to bring claims against new parties in Counts IV-VI, and to clarify Plaintiff's request for relief under 29 U.S.C. § 1132(a)(3). These amendments are not futile. However, none of the other counts in the proposed Second Amended Complaint will be permitted to proceed in light of the Court's decision above.

## **V.**    **Conclusion**

For the reasons stated above, Defendant's motion to dismiss is granted in part and denied in part. An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: January 30, 2014